LARRY D. VAUGHT, Judge
Joseph DeWayne Duren was found guilty by a Faulkner County jury of internet stalking of a child pursuant to Arkansas Code Annotated section 5-27-306 (Repl. 2013) and was sentenced to 240 months in prison. On appeal, Duren challenges the sufficiency of the evidence supporting his conviction. We affirm.
At trial, fourteen-year-old B.T. testified that in mid-2015 she used her phone to message Duren, who was twenty-three years old at the time, using an internet-based phone application called Snapsext.[1] B.T. told Duren that she was twenty-six years old. B.T. did not meet with Duren and did not send him any pictures of her.
On February 1, 2016, Jason Bollinger, B.T.'s guardian, discovered that B.T. had been messaging Duren. Bollinger confiscated B.T.'s phone, changed the passwords *557 on the Snapsext website, and gave the phone to Chad Meli of the Faulkner County Sheriff's Department. Officer Meli confirmed that on February 1, 2016, he received a phone from Bollinger along with a report that a fourteen-year-old girl had been using the phone to message Duren on Snapsext. That day, Officer Meli extracted the Snapsext data from the phone. The Snapsext conversations between Duren and B.T.-who said she was twenty-six years old-were sexual in nature. At one point, B.T. asked Duren at what age was the youngest girl he would have sex with, to which Duren said sixteen. B.T. (lied and) said that her sister, who was fourteen and a virgin, wanted to have sex with someone "who knows what they're doing." Duren responded, "This will sound shallow so I'm sorry for this, but what does she look like?" B.T. did not respond. That was the final Snapsext conversation between B.T. and Duren.
Officer Meli, acting as "B.T.," attempted to communicate with Duren on Snapsext, but Duren did not respond. Officer Meli, again acting as "B.T.," texted Duren's cell phone, and he responded.[2] "B.T." immediately told Duren that she was not twenty-six years old and that she did not have a younger sister. "B.T." told Duren that she was fourteen years old. Duren and "B.T." discussed what it would be like for "B.T." to have sex for the first time. Then "B.T." asked Duren if he ever came to Conway. Duren responded that he was in Little Rock almost every night for school. "B.T." said, "[Y]ou should sneak me out one night." At this point, Duren texted, "Let's say I did tonight. What would you want me to do?" "B.T." responded, "I wanna try and go all the way."
Then Duren and "B.T." texted each other a picture. The State introduced the photographs into evidence. In the picture Duren sent to "B.T.," he was holding his friend's baby. The picture "B.T." sent to Duren depicted a prepubescent female holding a stuffed animal. Duren and "B.T." agreed that if Duren traveled to Conway that night, "B.T." would sneak out to meet him at Harps grocery store. He described his vehicle. "B.T." asked Duren to bring some rum, and he agreed. "B.T." also asked if Duren had a "rubber," because she did not want to get "preggers," and Duren said he had condoms. "B.T." told Duren to text her when he arrived at Harps, and he did. Officer Meli arrested Duren in the Harps parking lot. The search of his vehicle revealed condoms, K-Y Jelly, a bottle of rum, a knife (tucked between the driver's seat and the console), and his cell phone.
Duren testified at trial that he had messaged B.T. on Snapsext one time in mid-2015. He said that he thought he had been talking to a twenty-six-year old woman during that chat and that he was not "thinking straight" when he made comments about B.T.'s sister because he was "inebriated." He said that he tried to message B.T. again on Snapsext, but she did not respond. He said that about six months later he received text messages from whom he thought was B.T. He admitted that he knew at that time B.T. was fourteen years old and that she was asking about how to lose her virginity. He testified that he did not want to sleep with B.T.; rather, he said that he showed false interest in her so that he could meet her to warn her that she was making a mistake by trying to have sex with an older man.
At trial, the defense moved for a directed verdict at the close of the State's case, and again at the close of all the *558 evidence, arguing that there was no evidence that Duren used the internet to entice B.T. into a meeting for sex. The circuit court denied the directed-verdict motions. Thereafter, the jury convicted Duren of internet stalking of a child. This appeal followed. Duren's only argument on appeal is that the circuit court erred in denying his motion for a directed verdict because the State lacked sufficient evidence to show that he used a "computer online service, internet service, or local internet bulletin board" to arrange a meeting with a fourteen-year-old girl to engage in sex.
We treat a motion for a directed verdict as a challenge to the sufficiency of the evidence. Kelley v. State , 103 Ark. App. 110, 114, 286 S.W.3d 746, 749 (2008). In reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. Id. , 286 S.W.3d at 749. We affirm a conviction if substantial evidence exists to support it. Id. , 286 S.W.3d at 749. Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. Id. , 286 S.W.3d at 749. We defer to the jury's determination on the matter of witness credibility. Id. , 286 S.W.3d at 749. Jurors do not and need not view each fact in isolation; rather, they may consider the evidence as a whole. Id. , 286 S.W.3d at 749. The jury is entitled to draw any reasonable inference from circumstantial evidence to the same extent that it can from direct evidence. Id. , 286 S.W.3d at 749.
Duren's appeal requires us to interpret a statute. The first rule in considering the meaning and effect of a statute is to construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language. Holcomb v. State , 2014 Ark. 141, at 3, 432 S.W.3d 600, 602. When the language is plain and unambiguous, there is no need to resort to rules of statutory construction, and the analysis need go no further. Id. , 432 S.W.3d at 602. We review issues of statutory interpretation de novo because it is for the appellate court to decide what a statute means. Id. , 432 S.W.3d at 602. When dealing with a penal statute, the appellate court strictly construes the statute in favor of the party sought to be penalized. Id. , 432 S.W.3d at 602.
The relevant statute, Arkansas Code Annotate section 5-27-306(a), entitled "Internet stalking of a child," states as follows:
(a) A person commits the offense of internet stalking of a child if the person being twenty-one (21) years of age or older knowingly uses a computer online service, internet service, or local internet bulletin board service to:
....
(2) Seduce, solicit, lure, or entice an individual that the person believes to be fifteen (15) years of age or younger in an effort to arrange a meeting with the *559 individual for the purpose of engaging in:
(A) Sexual intercourse;
(B) Sexually explicit conduct; or
(C) Deviate sexual activity [or]
....
(4) Compile, transmit, publish, reproduce, buy, sell, receive, exchange, or disseminate the name, telephone number, electronic mail address, residence address, picture, physical description, characteristics, or any other identifying information on an individual that the person believes to be fifteen (15) years of age or younger in furtherance of an effort to arrange a meeting with the individual for the purpose of engaging in:
(A) Sexual intercourse;
(B) Sexually explicit conduct; or
(C) Deviate sexual activity.
Ark. Code Ann. § 5-27-306(a)(2), (4).
On appeal, Duren concedes that his 2015 Snapsext conversations with B.T. took place over the internet; however, he argues evidence from those conversations fails to support his conviction for internet stalking of a child because Duren thought he was conversing with a twenty-six-year-old woman and no meeting was set up. We agree. While there is no question that the Snapsext conversation occurred on the internet, the evidence was undisputed that during the Snapsext conversations, Duren believed he was communicating with a twenty-six-year-old woman and no meeting was arranged. Thus, these conversations fail to support Duren's conviction under section 5-27-306(a).
Regarding Duren's text messages with Officer Meli, acting as "B.T.," Duren admitted that he believed he was communicating with a fourteen-year-old girl. During this conversation, Duren and "B.T." discussed having sex, they exchanged pictures, there was undisputed evidence that Duren and "B.T." arranged a meeting, and there was evidence that the meeting was for the purpose of engaging in sexual intercourse, sexually explicit conduct, or deviate sexual activity.[3] However, Duren argues this evidence is insufficient to support his conviction because the entirety of the 2016 communications "took place exclusively in texts over cell phone voice lines " (emphasis in original)-not over the internet as required by statute.
This issue was disputed at trial. Officer Meli, who was qualified as an expert witness in extracting data from computers and mobile devices, testified that after he seized Duren's cell phone, he (Officer Meli) extracted the texts and photographs Duren had exchanged with "B.T." Officer Meli stated that the text messages had been sent over the phone line; not the internet. However, he also testified-several times-that the pictures that Duren and "B.T." exchanged had been sent over the internet:
Q: The pictures ... are they sent in the same way, the same manner that text messages are sent?
A: They are not, no, ma'am.
Q: How are they sent?
A: They're sent over data. Text messages are sent over just voice lines. Text messages are able to be converted over the voice lines. Multimedia messages, photographs, videos, things of that nature require data so they're not able to go over the same-the same manner.
Q: Okay. How are they transmitted then? How is data transmitted-
A: Sure.
Q: -if it can't go over the voice line?
A: Online via the internet.
....
Q: So [the photographs] pass[ ] through the internet.
A: Correct.
At trial, Officer Meli was cross-examined on this issue, yet the officer's opinion did not change:
Q: I guess what I'm having a problem with is how is the internet involved in the te[x]t messaging conversation that you're having with [Duren]?
*560 A: When they do the conversion to data just for the photographs that were exchanged.
Q: And you're talking about where he's holding what he says is his niece.
A: Correct. And he asked what I looked like and I provided him a photograph of my undercover photograph.
Q: And so that was the only time that the internet was used as far as when the text messaging started. Is that correct.
A: Correct, yes, sir.
Officer Meli maintained that the two photographs were sent via the internet.
On appeal, Duren essentially asks this court to reweigh the evidence on this point. We decline to do so. We do not attempt to weigh the evidence or pass on the credibility of witnesses; that duty is left to the trier of fact. Harris v. State , 331 Ark. 353, 355, 961 S.W.2d 737, 739 (1998). Accordingly, we hold that there was substantial evidence to support the jury's finding that when Duren and "B.T." exchanged pictures, he used the internet as required by section 5-27-306(a).[4]
We must next consider whether the two pictures-the one of Duren holding his friend's baby and the one of a prepubescent young girl (purportedly "B.T.") holding a stuffed animal-sent over the internet are sufficient to satisfy the applicable internet-stalking-of-a-child statute. Duren contends that these pictures were "tasteful" and not explicit in any way, that the photos were not conversation, and that the "sexual talk" and the meeting that was arranged occurred in the text messages over the phone line not the internet. He argues, "[A]ll the elements that made up the requirements of section 5-27-306 were made in the texts. And the texts went over the voice lines and not the internet."
We disagree with Duren's interpretation of the statute. Section 5-27-306(a)(4) provides that a person commits the offense of internet stalking of a child if the person being twenty-one years of age or older knowingly uses an internet service to receive a picture of an individual that the person believes to be fifteen years of age or younger in furtherance of an effort to arrange a meeting with the individual for the purpose of engaging in sexual intercourse, sexually explicit conduct, or deviate sexual activity. Ark. Code Ann. § 5-27-306(a)(4). The State presented evidence that Duren solicited and received a picture from "B.T." over the internet in furtherance of his effort to arrange a meeting with her for the purpose of having sex. We note that Duren did not actually arrange the meeting with "B.T." until after he received the picture of the young girl holding a stuffed animal. This is substantial evidence that supports his conviction under section 5-27-306(a).
*561 We acknowledge that the picture of "B.T." alone does not establish all of the required elements of section 5-27-306(a). In fact, many of the statutory elements were established in the February 2016 text exchange over the phone line. However, the plain language of subsection (a)(4) merely requires that Duren use the internet to receive a picture of "B.T." in furtherance of an effort to arrange a meeting with her for the purpose of engaging in sex. Based on Officer Meli's testimony that the picture of "B.T." was sent to Duren over the internet, along with the other evidence included in the 2016 text messages-admitted without objection at trial-that demonstrated that Duren believed "B.T." was fourteen years old and that he arranged a meeting with her for the purpose of engaging in sex, we hold that substantial evidence that supports Duren's internet-stalking-of-a-child conviction.
Affirmed.
Abramson and Hixson, JJ., agree.

At trial, Snapsext was described as an adult social-networking website focused primarily on the communication of sex-related activities and the coordination of "hookups."

Officer Meli obtained Duren's phone number from the data extracted from Snapsext; Duren had given B.T. the same cell-phone number during their Snapsext chat.

The State's evidence included the text messages, which were sexual in nature, and the condoms, K-Y Jelly, alcohol, and knife found in Duren's vehicle upon his arrest.

In March 2017, the Arkansas General Assembly amended section 5-27-306(a) as follows:
(a) A person commits the offense of internet stalking of a child if the person being twenty-one (21) years of age or older knowingly uses a computer online service, internet service, local internet bulletin board service, or any means of electronic communication to....
Ark. Code Ann. § 5-27-306(a) (Supp. 2017) (emphasis added). Duren contends that the amendment is significant because it demonstrates that the prior statute, which applies to him, was limited to internet communications and did not criminalize other types of electronic communication like texting that takes place over the phone line. While the amendment does broaden the reach of the statute beyond the use of the internet, it lacks the significance claimed by Duren because substantial evidence supports the jury's conclusion that Duren used the internet when he exchanged photographs with "B.T."